Good morning, ladies and gentlemen. You may be seated. We have three judges on the video, and can you hear me, Judge Reinhart? I can. Good morning. And Judge Graber? Yes, I can. Thank you. Good morning. And Judge Hurwitz? I can, too. Thank you. Good morning. And we are missing a fourth judge. Judge Willie Fletcher is trapped on BART at the moment, and he told us to go ahead and proceed. They had a BART shut down, and it's not moving. So rather than delay, he will watch the video, and then he, with any luck, may be able to join us at conference. So he extends his apologies, but he told us to proceed. So with that, please proceed. Good morning. May it please the Court, my name is Jahan Saghafi, and I represent plaintiff appellants.  This case asks whether the FLSA actually allows payment of $2.13 an hour to a waitress for scrubbing urinals and toilets and mopping floors after the restaurant closes. Does the FLSA allow $2.13 an hour for waiters to chop vegetables and roll silverware for hours during the day? No. That would make a mockery of the tip credit and the FLSA, because when it happens, it drives down servers' wages, pushes them into poverty, and shoves janitors and prep cooks and dishwashers into the unemployment lines. That's exactly what the FLSA is meant to prevent. The Ninth Circuit should not create a circuit split by endorsing such a permissive view of the tip credit rule. Rather, this Court should join its sister circuits, accepting the strong majority position that the 20 percent rule is appropriate under the FLSA, the regulations, the DOL's opinion letters, amicus briefs, and field operations handbook. This boils down to whether the DOL's consistent and reasonable interpretation of the ambiguous statute and regulations is plainly erroneous or inconsistent with the regulations. It's not. So our requires this Court to defer to the DOL's considered expertise and preserve a harmonious body of tip credit jurisprudence nationwide. This will also fulfill Congress's goals in enacting and updating the FLSA to help the working poor, the millions of waiters, bartenders, car wash workers, airport attendants, and busboys to stay above the waterline of the poverty level. In the Senate's words, to earn a living wage. So the starting point is the statute. 203T is ambiguous. Sotomayor, can I ask a question? Yes, Your Honor. Do you think the regulation is ambiguous? Yes, Your Honor. The 56E. So could the DOL have interpreted it the way the majority of the panel did? No, I don't think so, because the ---- How can it be ambiguous? My difficulty with the argument you're making is that if it's ambiguous and we want to give our deference to the DOL's interpretation, that it has to be interpretable more than one way, no? Yes, Judge Hurwitz. So just because something's ambiguous doesn't mean that any interpretation is valid. So it's ambiguous in the sense that it's unclear how to tell when a waiter is just a waiter and when a waiter is part waiter and part maintenance man. There has to be some way to tell. But you can't throw up your hands and say, during the course of the day, we're just going to close our eyes. And he can do as much maintenance man work as he wants, as the restaurant wants, but we're not going to call him a maintenance man. So I think that's ---- But it wouldn't be that counter, because there's occasionally ---- Go ahead. Go ahead, please. Judge Kramer, go ahead. I had a question. How is it that time helps you answer that question? The regulation, at least in one example, doesn't refer to time at all. It refers to someone who's a waiter and a maintenance man. And I don't understand what time has to do with that, because if someone is told to go fix the boiler and if it takes 5% of his time or 95% of his time, it's a separate occupation. And I don't understand how timekeeping helps to flesh out the question of when one occupation is happening and when a different occupation is happening. Judge Graber, that's a great question. The 20% tolerance is only for the related duties. So in the maintenance man situation, the maintenance man work is unrelated to being a waiter. Being a waiter is taking orders, delivering food, talking to the customer. Being a maintenance man is grabbing a screwdriver and fixing something. So since it's unrelated, time doesn't matter. So if you do it for half an hour, if you do it for four hours, it's unrelated. I think the majority opinion accepts and everybody accepts that that's just a different job. As long as you have the dual jobs regulation, that's a different job. The way in which time becomes ---- Isn't that the entire point of the regulation, which is called dual jobs? Yes. And so the question is, it seems to me the question is whether the duties are sufficiently related that they comprise the same occupation, again, regardless of the amount of time spent. So the focus, it seems to me, of the regulation is entirely on what comprises a particular occupation and not how much time is spent on any particular part of that. So let me answer your question by digging into the specifics of what the 20% tolerance means. So this is a buffer. This is a safe harbor that the DOL granted as essentially a gift or a safe harbor to the restaurants to say, you can have the waitress do her job, but up to 20% of the time. So in an eight-hour day, that's 100 minutes. So an hour and a half of her time can be spent doing other work that's not tip generating. She can go back and slice a lime for somebody who wants a lime in their Coke. She can roll a new set of silverware for somebody who dropped their fork. She can go make coffee if the expediter failed to make the coffee. The kitchen staff isn't up to speed. She can go make some coffee. She can spend three, four, five minutes making coffee. She can spend 30 seconds or a minute rolling silverware. She can spend five minutes chopping vegetables. That is a far cry from 100 minutes during the course of the day, an hour and a half. The quantitative test is actually also a qualitative test because once you're spending 20% of your time, an hour and a half, two hours, three hours of the day, chopping vegetables or rolling silverware or filling salt shakers, you have become a different kind of worker. You have become kitchen staff. You are doing the job that the expediter does. You're doing the job that the inventory person does. So if you did not treat it the way the regulation and the supplemental interpretation is, you would take those related functions and make them a dual job, I assume, because if they're only related to the job of a waitress but they're not included within the job of a waitress, there must be somebody else who normally does that job. As you said, if you go make coffee, there's someone else, say a cook, who would otherwise make the coffee. So I assume the alternative would be that these related jobs would not, since they're not the waitress's job but there's something related to it, must be part of another function, another occupation, and then they would also under that view also have to be paid, although the employer wouldn't get the benefit of the related performance. It would go as another occupation that he is now performing. That's right, Judge Reinhardt. So if the restaurant requires the waitress to go away from the customer for two hours at a time to fill salt shakers, how many salt shakers can she fill in two hours? How many bottles of ketchup can she marry in two hours? She's not talking to her customers. She doesn't have the opportunity to get a tip. I've never tipped anybody for filling 100 salt shakers. Sorry, Your Honor. Is there some other occupation? Yes. That would cover the work of the salt shaker? Yes. So that she would then be performing another occupation. Exactly, Your Honor. Sorry. Yes, Your Honor. The result would be the same except that the employer would not get the benefit of the permitted 20% that the waitress is now working in another occupation. That's right, Your Honor. It only happens to be another occupation that is sufficiently related to the waitress's work that you can give the employer the benefit of it. Let me pose it this way. The crux of the analysis is customer interaction. So a tipped job is tipped because the customer sees and rewards good service. That's in the legislative history. That's in the regulations. That's in common sense. What are the two jobs that Alec Marsh has? The regulation is for dual jobs. What are his dual jobs? What are the two jobs he has? So for most of these people, the dual jobs would be waiter or waitress and kitchen staff. So I was so they're saying that everything else he does other than his tipped occupation falls under the dual job. The second job is kitchen staff job. There's a kitchen staff job. Is that your position? Your Honor, I actually don't remember specifically about Mr. Marsh. But there is a mix of work, and there is a utility player position that many of the cleaning the soft drink dispenser and nozzles, replacing soft drink syrup, stocking ice, wiping down tables, taking out trash, rolling silverware, scrubbing walls, sweeping floors, restocking tuque oak supplies, cleaning booths, cleaning ramekins, and cleaning restrooms. So all of those tasks, you say there's some job called kitchen staff job that would be hired, you would advertise for kitchen staff person who would have all these other assignments. So there is such a position as kitchen staff that restaurants typically hire for. There's also dishwasher. There's also janitor. There's also inventory. Right. But what if it's two jobs? So it may be that he has more than two jobs. So you're wondering is could the dual jobs be a triple jobs? Is that the question? So for each task, it's a separate job. You sort of put them together in some way? Or how do you figure that out? So the starting point is there is a putative tipped job that the employer wants to get the benefit of to be able to pay $2 an hour, right? So we start with a tipped job. The tipped job is waiter or waitress. The other job could be janitor. This says dual jobs. It says, for example, maintenance man and waiter. So two jobs that are recognized. I was just wondering what they were in this case. But there really isn't one, right? So I think you're pointing to an ambiguity in the regulation, which is that the regulation is illustrative, it's not definitional, and it speaks in the phrase dual jobs. It talks about a waiter and a maintenance man. It would seem inconsistent. Right. And then it goes on to say, but when you have a bunch of different duties, that falls within the waitress job or that falls within the counterman job. So it would seem inconsistent with the Congress' intent and the DOL's intent to say it's a dual jobs regulation. He's a waiter. He's a maintenance man. Let's pay him appropriately for both jobs. But if he's also a janitor, all bets are off. They can pay him $2 an hour. I don't think that would make sense if that's where you're headed. So if it's a triple job and there are two un-tipped jobs, if the restaurant is loading more un-tipped work on them and pulling them further away from the customer and further away from the opportunity to earn tips and driving their wages down further and pushing them further into poverty, I don't think that that would be consistent with what the FLSA instructed in 1938, in 1966, in 1974 to ensure that the tip credit would not be abused and would only be allowed for tipped occupation, for tipped work where someone can earn a tip. So handing them a mop and sending them to the bathroom where they can't see the customer anymore is classically an example of a dual job, a second job that's un-tipped where they cannot get the benefit of that customer interaction and push their wages up from $2 to $3 to $4, hopefully up above the $10 an hour poverty level for a family of four in 2018. How is this going to work? How is your proposed—I'm sorry. I know there's many. How does your rule work as a practical matter in the workforce?  Do they need to be keeping track of their time? Or how will your proposal work? So thank you, Judge Wardlaw. The starting point is that the restaurant controls the workplace, right? The restaurant doesn't need to fear that waitresses are going to secretly abscond to a separate room and go roll silverware hiding away from the customer. The waitress took the job because she wants to serve customers, and with 71 percent of her earnings dependent on the customer, she certainly wants to be there in front of the customer giving good service. So the starting point is that the restaurant has the opportunity to and must structure the job so that it is consistent with tip work. So we have employers that when they want to hand a broom or a mop to the waitress when she comes in, they have her clock in at the minimum wage. The restaurant is closed. She's mopping the floor. They can have her do whatever they want. Then when they get their first customer, they just go over to the register, and they use their fingerprint, or they type in their ID, or they swipe their card. With today's technology, that may take one second. That may take four seconds. She's shifted over to the tip credit rate. So she starts her day at $7.25. She shifts over to $2.13 as soon as that first customer comes. And then from that point on, she's almost definitely within the 20 percent tolerance because a restaurant that's faithfully trying to follow the law is not going to send her away to another room. They're not going to send her back to the kitchen for an hour or two at a time. They're going to let her do her job. And the restaurant needs to also hire the appropriate staff. So we have litigation against companies that just decided, you know what, we can pay the waitress $2 an hour to be a janitor, so let's just fire all the janitors. We don't need any janitors. We have companies that have done that. We have companies that don't have dishwashers. Because why hire a dishwasher at $7.25 when you can have the waitress do it for $2? And that's exactly what the FLSA is meant to prevent. Counsel, I take it you think that the FAST decision was correctly decided. Yes, Your Honor. At the time the FAST decision was decided, we didn't have SmithKline, right? Yes, Your Honor. So what about that? Should we be concerned that the agency hasn't really given fair notice of this handbook rule? I'm going to call it the handbook rule. Well, okay, is this a question oriented towards our or oriented towards the reading of the? Our. Okay. Whether our deference is appropriate. Okay, so. In other words, if we, I'm not trying to be cryptic, if we agree with you about FAST and say, okay, this regulation is arguably, we think it's ambiguous, and if we agree that the interpretation given by the department is not inconsistent or is, of course, consistent, maybe our deference is appropriate. But SmithKline talked about an instance where that might not be the case if the agency hasn't given proper notice or if it might be a surprise. Okay. Sorry. I apologize for not understanding earlier. So in SmithKline, the DOL had flip-flopped during the litigation. They gave a different rationale during the course of the litigation. They were all over the place. Right. So this is easily distinguishable from SmithKline, where we have considered engagement with the community in the opinion letters from the 70s to the 80s to the 2000s. The opinion letters, though, that you're talking about, I think were in existence as of the time of the FAST court. Yes, Your Honor. And so there's this handbook. I'm going to just call it the handbook rule. And the handbook has what I think of as a disclaimer on it, right? Go ahead. Yes. Okay. And because it says that it won't be used for interpreting the reg. And my question is, I appreciate that the agency has adopted this position now and given notice by doing that in an amicus brief, and I understand about the letters that you have cited. But I can't find in the record anywhere where I am referring to as a disclaimer has come off the handbook, even since the FAST decision. Is that in our record? I don't believe so. I want to try. I think there are a couple of interesting parts of your question. So let me start with the handbook. The handbook disclaimer is not as much of a disclaimer as some litigants have made of it. So let's see what the handbook says. It says it's an operations manual that provides investigators and staff interpretations. And in the sentence before the sentence that the defendants like to quote, it says the field operations handbook reflects policies established through changes in legislation, regulations, significant court decisions, and the decisions and opinions of the administrator. It is not used as a device for establishing interpretive policy. So what it is, it's a distillation of actual policy. And that's what they've done. They've struggled with all these opinion letters that were dealing with spot situations, just like court cases do. And it draws the lines and it draws the boundaries and it says, okay, in light of all this and in light of the regulation, in light of the instructions from Congress, we're going to distill this into a rule. And so they've done that. They have not established policy, but they are declaring policy. And as the sentence before the quote, unquote, disclaimer says, it reflects policies established. So it's reflecting policies already established. So I think I've only answered part of your question. Go ahead. I don't want to interrupt you. Okay. So then I guess the rest of the question is, are we assuming that ours still exists right now? Yes. Okay. I am. Okay. Okay. I certainly hope so. Yeah. Yesterday it seemed to continue to exist. So my question really goes to, I'm not so sure it's enough for the regulation to be ambiguous and for the interpretation by the department to be consistent. What about SmithKline? Yes. Should we be concerned that folks who are eligible, you know, subject to this interpretation have or are going to be unfairly surprised if they have adequate notice? That's what I'm getting at. I think we have the opposite situation that we had in SmithKline. In SmithKline, there was unfair surprise because the DOL surprised a whole industry risking massive new liability, having had no enforcement actions during decades of what the Court called a very lengthy period of conspicuous inaction. It first announced its position in amicus briefs. In that case. In that case. And the DOL reasoning changed during the litigation. Here we have 50 years of the DOL taking the 1966 amendment, 1967 dual-jobs regulation, 1979, 83, 85, 2000, I forget, the different opinion letters. But it's not 50 years, right? So it's been consistent. Well, in terms of public notice, isn't — when you say it's been consistent, didn't they first adopt this in a — in the amicus brief in FAST? No. They established it in the Field Operations Handbook in 1988, so 30 years ago. I don't think they told anybody about it. When was that first put online? I apologize, Your Honor. I do not know. I think the Internet was not in quite the shape it is today back then. Right. But it was a handbook for investigators to take to restaurants and say, are you breaking the law?  And I'm not trying to belabor the point. It's just that I don't think that gets you there. If the question is unfair surprise, a handbook that's for internal use, I just really question whether that's giving fair notice. In FAST, I think they did. And there are opinion letters that I think predate FAST. Yes. It seems like a stronger argument, but that is the gist of my question. And maybe you've answered it. I'm not sure if I have. The disclaimer is not taken off the manual, even today. I don't think that's in our record, although I'm happy to have you correct me. But you're saying that you want to – you're asking me to focus on the word establishing, interpretive policy. It's not used for establishing. Right. But that it is sufficient, because now it's been online certainly since at least 2008, that the Department has given notice that that is its policy, even though the handbook's not used for establishing the policy. Right. And it's reflecting what the DOL had been doing for those decades. So the rest – this is the opposite situation from SmithKline. SmithKline was creative lawyers saying, gosh, pharma sales reps have been doing this job for a long time. Maybe they're exempt. Maybe they're not exempt. Let's try it. This – what we have here is the restaurants are making a creative argument in recent years after the opinion letters being in existence for decades, after the handbook being in existence for 30 years, and now they're saying, well, you know what, maybe we can pay these guys $2 an hour. But the practice has existed, and restaurants and workers are abiding by what's in the handbook. And the handbook, I think, is a reasonable – I'm going to save my time unless there are other questions at the moment, but I think to close on your question, Judge Christian, the handbook is the distillation of these different points of the opinion letters, and that's really meaningful. The opinion letters give us this concept of a clear dividing line between duties – not between time – between duties. And it's told us, you know, before opening, that's a danger area. After closing, that can be a danger area. And having them do work that's focused on one employee as opposed to generally assigned, that's a danger area. And it's talked in percentages – 30 percent, 40 percent is a red flag. So the field operations handbook is by no means coming out of nowhere like SmithKline. It's just the rational distillation of what has already been happening. And it's consistent with the dual jobs regulation because I think the quantitative, qualitative significance of the 20 percent rule is really important. Once I, as a restaurant owner, force my waitress to stay away from the customers and go to a room and fill 100 salt shakers and fill 100 ketchup bottles for two hours during the course of the day, more than 20 percent, she's not seeing the customers. She is in a dual job. She – it has transformed into a different job. She is an expediter or she is a kitchen staff or she is something, but she is not a waitress. We do not look at that person who is in another room from the customers and call her a waitress. So I'll save the rest of my time. Thank you.  Thank you, counsel. May it please the Court. Paul DeCamp from Epstein, Becker & Green for all of the employers in these nine cases. I think it's important to note that beneath this wonky, in-the-rabbit-hole, wage-an-hour issue at the Department of Labor, there's lurking a very important separation of powers concern. It's tempting to say the Department of Labor does good things. They enforce statutes that help the little guy, and so we don't want courts getting too much into the field of micromanaging what happens in workplaces, so it's tempting to defer to the Department of Labor. That's fine, but if the Court approves the actions of the Department of Labor here in going as far afield as they did of the statute that Congress enacted, I guarantee that that grant of power to the executive branch will be the first case that parties cite the next time there's a challenge in executive branch overreach. What the Department of Labor did here is an extraordinary power grab, and we'll talk about why that is. Counsel, I have a sort of prefatory question, which is, as I understand it, you are not challenging the validity of the regulation itself, the underlying regulation, but only the interpretation of it. Is that correct? That's not quite correct, Your Honor. We are challenging the regulation itself, that it's not entitled to Chevron deference. It's not, strictly speaking, a procedural challenge, an APA challenge to the issuance of the regulation, but it is a challenge to the level of deference, and that's based, among other things, on Encino motor cars. There was no explanation given by the Department as to why it issued its regulation, and I'll talk a bit about why exactly the regulation itself is inconsistent with the statute, inconsistent with congressional intent as expressed in Legislative I want to understand your position. Is it that the regulation gets no deference or not Chevron deference? Not Chevron deference, Your Honor, that it would get Skidmore. That it would get Skidmore deference? Yes, Your Honor. And we would argue that applying the Skidmore standard. If it gets deference, if it gets some deference, then it can't be inconsistent with the statute, can it? I'm not saying. Because if it were inconsistent with the statute, we would give it no deference. I'm not saying that the Court should give the regulation deference. What I'm saying is that the framework to apply is Skidmore using the analysis of the reasoning, the power to persuade, the consistency or not with the statute. We argue there is. Okay, so let's go back. I want to then go back to Judge Reinhart's question. We have a statutory exception from the minimum wage for employees who receive tips. Is it your position that the Department doesn't have the ability to say when only part of the job is tip-producing, the tips exception only applies to that part of the job? Yes, Your Honor. So you think that as long as any portion of an employee's job is tips-producing, then the employer is excused from paying the minimum wage for the entirety of that employee's employment? No, Your Honor. And what's important here is that. Therefore, the Department. Well, the answer is no. Therefore, the Department must have the ability to say there's a dividing line somewhere, doesn't it? It has to be consistent with what Congress said. And I think the legislative history sheds light on that exact point. If I may address it. Counsel, can I just clarify? So your position is essentially that the employee is getting the minimum wage. It's just that it's in order to calculate the minimum wage, it's including the tips that they're getting. So why isn't that in conflict with the statute provision that says that the tips are the employee's own property? The statute does not say that. It says something like that. I'm paraphrasing. But the tips are discretionary and they are given to the employee for good service, and it's not something that's given to the employer to be used to count in its favor up to the minimum wage. Your Honor, I think it would be helpful to talk about what section. You can answer my question, because to me it seems pretty stark. It's a big bottom line difference is that your employers want to include the amount attributable to tips to say that they're in compliance with the minimum wage law, right? Yes, Your Honor. Okay. So why isn't that inconsistent with the statute? The statute permits exactly this. Section 3M of the FLSA sets up a number of definitions for wages. It's not just cash wages that — and it's not just for tipped employment. Section 3M says that other things that are not cash wages from the employer can satisfy the minimum wage. For example, it lists meals, lodging, other facilities. Under those circumstances, other items of value can be credited against the employer's wage obligation. But it doesn't say that tips can be. It does. It's exactly, Your Honor, what section 3M says. That's the provision of 3M. What section 3M says is that at least in instances where employees are earning more than, at the time it was $20 a month, now it's $30 a month in tips, the employer may treat as wages defined under the FLSA the tips that the employee receives up to the amount of the minimum wage. So subject to the tip credit, they have to provide a cash wage of at least $2.13 per hour. For tipped work. It doesn't say for tipped work. It says tipped employee. One who customarily and regularly receives at least now $30 per month in tips. What the Senate said about this ---- Kagan. But, Counsel, can I ---- right here, maybe you're getting ready to answer this part of the question, but this just seems to me precisely the kind of hole left in a statutory scheme that an agency typically fills in by regulation. And you seem to think that this was, even at the regulatory level, that the agency overstepped? Yes, Your Honor. What's your best argument? What Congress said about this, in the 1974 Senate report, and we cite it in our brief in the P.F. Chang's brief at page 26, what Congress said was this. In establishments where the employee performs a variety of different jobs, the employee's status as one who, quote, customarily and regularly receives tips, close quote, will be determined on the basis of the employee's activities over the entire work week. What Congress said is that we're not looking at these 10 minutes are tipped and these 20 minutes are not. They said, you look at the work week as a whole, it's either tipped employment or it isn't. That's what Congress said. That's in the Senate report. So what DOL can do ---- Did Congress say that in the statute? No, Your Honor. If I can channel Justice Scalia for a moment, why should we pay any attention to the Senate report? If we're not going to pay attention to what Congress said, then ---- Well, I mean, we have several Supreme Court opinions in which the majority says, or at least several Supreme Court justices say, these reports are not reliable. We should look at the statutory language rather than the report. I take it you disagree with that method of statutory interpretation. Well, Your Honor, whether I agree or not isn't germane. What is germane is that the Supreme Court majority takes the view that legislative history is a relevant consideration, not the only consideration, but a relevant consideration. What's the last opinion in which the majority said that? I don't know that, Your Honor. As I read the last several opinions, they're sort of hedging. They're saying, whether or not we rely on legislative history, here's our result. So I'm looking at the statutory language. Put aside the legislative history for a moment. What's your best argument from the statutory language? The language of the statute of Section 3M talking about defining what a tipped employee is, an employee who is in an occupation in which he customarily and regularly receives more than $30 per month in tips. That's the language. There is no focus in the statute on the duties. The question is, did the employee in this employment, in this occupation, receive enough in tips that it is within Section 3M of the FLSA to allow the employer to count those tips because the employee's receiving these things of value. Can I go back to the question I asked you before because I'm not sure we focused on the answer. If somebody gets sufficient tips in 10% of their time because they're working at a high-end restaurant to fill in the minimum wage for the rest of the month, then they can be assigned to non-waitressing duties or non-tip duties for 90% of their employment? At $2 an hour. $2.13 or something. Is that right? That's correct under federal law. That's your position? Under 2, well, 2.13 under federal law, the answer to that question is that when we look at what the tasks are that the employee is performing, if those tasks are outside the scope of what would reasonably be considered the waitress occupation or the bartender occupation, go mow the lawn, go install the satellite dish on the roof, things that are not within the scope of the cluster of duties that one associates with the job. Then we would say now you're looking at time that would count against and that might be enough to make that work week, in this case, if it's 90% of the time, not tipped employment because the predominant work is outside that occupation. But when we're talking about activities... And we would define predominant how? Based on what Congress has said on the work week as a whole, a primary duty type analysis. But how do you define customarily and regularly performed? What mechanism specifically would be used to calculate that? Looking at the employee's earnings. I mean, there's regulatory guidance that the Department of Labor has issued. And what would you do with the earnings to determine whether or not the definition of customarily and regularly has been satisfied? How would you analyze those wages? I think it's easy enough to look at the tips that the employee receives, the cash wage that the employer is providing, and over the course of an extended period, recognizing there might be a fluky week here and there where the employee doesn't receive much in tips. Determining whether this employee is regularly receiving $30 a month or more in tips. Just to be clear, to follow Judge Hurwitz's question, in a high-end restaurant, you can make the $30. You're working 40 hours a week. You make $30 in tips in 10% of the time. That's quite likely. You can take the other 90% and it wouldn't come under this dual occupation. It could be five different occupations, right, that you use the same person for. It's not limited to dual. The whole other 90%, whatever they do, double, dual, triple, quadruple, they're paid as if they were a tipped employee. Again, looking at what the tasks are, if the restaurant has the tipped employee spending 10% of the time in a customer service type role and 90% in the kitchen cooking food, no customer interaction, I think at that point, consistent with what the Senate has said, that that would be a week that is predominantly not tipped employment and therefore not subject to the tip credit. But again, I think that the Court is able to — But the difficulty with this is that we have a statute, we have a regulation, and we have a handbook, correct? Correct. And now you want us to add a fourth layer that somehow the employer is going to go back to legislative history to figure this out. And that just doesn't seem to make any practical sense here. I mean, we have — so as I understand your position, we've got the statute and you're only saying that the regulation should get Chevron — I mean, Skidmore, correct? We're not saying it should get deference, but we're saying that the right framework for analyzing the deference is Skidmore. Is to look for Skidmore. And if you look at Skidmore, we understand what your position is. Correct. But what's missing in all this is the practical application for the reasons of the question just asked, where you have this person — you can be a tipped employee and get $30 the first day, particularly in — at the price they charge in San Francisco, and then you could go off and basically be in back room for the rest of the time under your analysis. How is the restaurant to know? And the real question is why isn't giving some baseline for this a reasonable interpretation of how to execute the regulation? There are a couple of responses to that, Your Honor. The first is we're not saying that there should be a fourth layer of difficulty. What we're saying is that the legislative history informs the meaning of the statute, which then informs the analysis of whether what the Department has done at a regulatory or subregulatory level is worthy of deference. The second piece of it, though, is that when we look at what Congress has said in the types of jobs that Congress has expressly told us are tipped employment, they listed in the same Senate report that I mentioned before. It's cited at page 24 of the P.F. Chang's brief. Waiters, bellhops, waitresses, countermen, busboys, service bartenders. Those are jobs that if you apply this 20 percent standard, it will incorrectly sort at least two, if not three, of those positions. Busboys, for example, and service bartenders almost never do work that would be considered tip generating. So we have a real problem because this 20 percent standard does not correctly identify positions that Congress has said are tipped employment. If we had a situation of a waitress or waiter who spends 20 percent of his or her time directly serving customers and 80 percent of his or her time bussing tables under the Department's analysis, this 20 percent standard, that would not be tipped employment. That 80 percent of the time would count against because it's not generating tips. What the Department has done here, and I'm not attributing motives. It's just we've gotten here through a path. The Department has distorted the original focus, which is the occupation and whether the duties are related to the occupation, and instead has made it about whether the duties are related to tips. The Department doesn't have the authority to do that. The Department can police the notion of is this an occupation, are these tasks within the scope of what would reasonably be expected for an occupation. We make a lot in our brief about the O-Net database, for example. Objective metrics, and that's page 29 to 36 of the P.F. Chang's brief. Objective metrics for what kinds of activities do people normally perform as a bartender, as a server, these sorts of things. There's data on these parts. So the whole thrust of DOL's regulation is just entirely off base? It is largely off base. Should have been looking at every kind of activity that a waiter or a waitress or a bartender might perform. The thing about the regulation. Or anybody that works in a restaurant. The thing about the regulation, Your Honor, is that as far as it goes, it's not a problem. Because what the regulation does is it says, we're going to talk about two ends of the spectrum. A dual job scenario where an employee has two non-overlapping jobs, that's the maintenance man and the waiter in the hotel restaurant. And then over here we have a couple of examples of individuals who have a broad cluster of job, of activities, but within a single job. We have the waitress who spends part of her time doing certain other activities, et cetera. And we have the counterman who may prepare his own short order cooks, short orders, and that sort of thing. Or may take a turn on the grill. So we have dual jobs here. That's an issue. We have not dual jobs over here. And that's fine. But what then the Department did is it said, everything that is not exactly the scenario on this end, which is the single job, everything up to that and all across the spectrum to the other end creates a dual job scenario. That's not a reasonable ---- Kagan. Is that how you read the opinion letter or is that how you read the handbook? The handbook, Your Honor. What about the opinion letters? The opinion letters, we can agree or disagree as to the results reached in particular opinion letters. But I think that what we see, at least in the genesis of the 79 opinion letter, was simply an ipsa dixit where the Department said, well, we think that preparing salads is the work of chefs. That's all they said. They don't cite any authority for it. There's no indication that in 1979 the Department had any experience identifying particular tasks in particular employments. And that's directly contrary to the objective database, the ONET database that the Department uses and sponsors and pays for with a grant that says that preparing salads and making food is at least one of the tasks that a server can perform. So that 1979 letter, it did a lot of things, but really what it did was it pulled from thin air the assertion, the unsupported, unreasonable, arbitrary assertion that making salads is the work of chefs and not the work of waiters and waitresses. That's where it was a bridge too far because it was not supported by any research, by any analysis. Now, if we had a job, I think one of the things about the 79 letter is that they were looking at two-hour blocks of time before the restaurant opened and the Department had a concern. I don't think they reached the right result in the 79 letter, but they were talking about a concern of an identifiable large block of time when the employee was not doing anything that would generate tips but instead was preparing salads or preparing the salad bar for use in the restaurant. And I think it's important to come back to the facts in our cases here. We have nine cases where there's not a single one of these complaints where we have allegations of people spending hours and hours on end rolling silverware, hours and hours on end making food, as was conceded during the oral argument before the panel by the plaintiffs, that what we have here is tasks interspersed throughout the day. It's five minutes here. It's two minutes there. That's very different from somebody spending half a shift, a whole shift doing some other task or taking a particular one of the tasks of the 24 or so that we might say are the server tasks, but only doing ones that don't include customer interaction. Could I interrupt for a second? I take it your position is that the Department could promulgate a regulation about unrelated work. Yes? Depending on what the Department said. In other words, being a janitor, being a waitress and a janitor, the Department could say your janitor time cannot be aggregated with your tips in order to keep you at the $2.13 an hour. No, Your Honor. What the Department could do is, consistent with the Senate report from the 1974 amendments, they could say we will look at the work week as a whole. And if your predominant activity in a work week is the janitor activity, then the tip credit does not apply at all for that week. The Department could do that. I want to understand your position. Your position is that as long as more than 50.00% of the time of the employee is spent on tipped occupations, then you can apply the $2.13 an hour wage to the remaining 50%. As long as the $30 an hour minimum is made. Yes, Your Honor. So you're just quarreling with the percentage? Not quarreling with the percentage. It's quarreling with the focus. No, but I mean if the guidance had been in the handbook 50%, you wouldn't have a problem with that under your theory, right? That's not correct, Your Honor. If the guidance in the handbook had been 50% of the time spent on tasks within the occupation, then I would not have a problem with the handbook. Instead, what it said is you have to spend, in effect, 80% or more of your time doing identifiable tasks in pursuit of tips. That's the bridge too far. That's what DOL can't do. The statute doesn't support that. The legislative history doesn't support that. And the regulation doesn't support that. It's the focus that has shifted from the statutory term of the occupation to the department's focus on tip-producing activities. Except, isn't that, counsel, isn't that an attempt to interpret the statutory term tipped employee, how you define a tipped employee? Because that is certainly an interpretive task. The term tipped employee is defined in the statute, and there is interpretation that goes into defining it, but the term is not ambiguous. It says, the language is very clear, and we've quoted it before, but it's the employee who's in an occupation who receives $30 a month or more in tips customarily and regularly. That's all that there is. And it's important to think about the policy behind Section 3M of the FLSA. Where do you get to the 50% in the statute? The 50% comes from the Senate report to the 1974 amendments. That's where the Senate said, and this is Senate Report 93-690, it said, that's a language I quoted before, but that you would determine the status as a tipped employee on the basis of the employee's activities over the entire work week. So the Senate specifically addressed this point. But you would rewrite the statute, in other words. I mean, as I listen to that, it's a question of almost putting a carrot in the statute after tipped employee and inserting your 50%, because you're in effect rewriting the statute. You're not looking to interpretation of some regulation. Your Honor, not to rewrite the statute, but certainly there is lots and lots of case law from the Supreme Court and other cases that have said, and other courts that have said that the legislative history is an important measure of what a statute means. Fundamentally, this is a court of law that is tasked with identifying what is the law that is going to apply in these cases. As part of that analysis and as part of figuring out whether DOL was within the zone of delegated authority that Congress gave it here, we have to take a look at what does the statute mean. Could I ask you a preliminary question, then? Do you believe the statute as it defines tipped employee is ambiguous? No, Your Honor. Well, if it's not ambiguous in terms of what's a tipped employee, why would we be going to the legislative history to determine what it means? The statute, I don't think that the court needs to. Courts frequently do. But I mean, I just heard a whole exegesis about the 50 percent. So I'm just having some trouble understanding your argument and then fitting it into what has been a traditional means of statutory interpretation. To be very clear, our position is that the statute is clear. The statute says if you make $30 a month in your job in tips, you're fine. How do you interpret engaged in an occupation? The word occupation isn't defined in the statute. Is that right? That is correct. The word occupation is not defined in the statute. I think that that's a word that when we look at the statutory context as a whole, is not intended to do a lot of work. Occupation is a job. We use in the unless there's a reason to use a different term, use the plain ordinary meaning associated with a term. And so to come back to the point, when we have an employee receiving the requisite  position, that employee is a tipped employee under the FLSA. As a fallback position, if the Court concludes the statute is ambiguous in that regard, then the legislative history is quite germane to show what the Senate intended, to what Congress intended in passing this term. It's important to think about the policies behind the minimum wage. Much was made in the argument about, well, if we let employers do this work at 2.13 an hour, then other employees like janitors won't get hired or they'll get different hours. And it was suggested that the FLSA is designed to prevent that. It's not. There is a provision in the FLSA that is intended to affect the assignment of work as among different employees, but that's the overtime premium. That is designed to relieve unemployment by, among other things, encouraging employers to spread work around among multiple employees instead of having it be in a few employees doing long hours of work. The minimum wage is not about spreading work. And it's important to understand there is no evasion here, because as long as the employee receives cash wages and tips sufficient to equal minimum wage, the employee's rights under the FLSA have been fully protected. That employee is just as protected as if that employee had gotten $7.25 an hour or whatever the relevant minimum wage will be at the time. That employee has received equal protection there. What the plaintiff's position here would do is entitle tipped employees to greater protection, minimum wage plus, and that's not something that the FLSA requires. Some States might require it. The Congress could require it if they wanted to. But that's not what the statute does. Just like the statute recognizes in its definitional section, 3M, that wages can include other things aside from simply cash payments from the employer, meals, lodging, that sort of thing, other facilities, they also recognize that at least for employees who on a regular basis, not sporadically, but on a regular basis are receiving tips beyond a de minimis amount per month, it is appropriate for the employer to treat those tips as satisfying the minimum wage, up to the minimum wage. Yes, Your Honor. Sotomayor, would you agree that if we accept your argument in ruling your favor, we would be creating a circuit split? Yes, Your Honor. And why should we do that? Your Honor, Fast v. Applebee's was decided wrongly. And I think that it is more clear now than was clear at the time. Christopher v. SmithKline was not on the books. The Department has vacillated in this case far more than the vacillation in Christopher v. SmithKline that cost the Department all deference. It didn't even – it's not just losing our deference. They didn't even get Skidmore deference in Christopher v. SmithKline. And that was over the narrow issue of how one interprets the term sell or sale. But it was also really different for reasons – I don't want to take a lot of your time – it was really different for reasons that opposing counsel has mentioned. Right. The interpretation was announced in the case in response to the case and so forth. The Supreme Court was pretty clear about that. There were reliance interests and other interests that were in play in that case. But the Court was also clear that when agencies vacillate, that will cost them our deference. There may still be other levels of deference like Skidmore that can be available, and we do the analysis there. But you don't agree with opposing counsel's argument that this has been the practice  rule for decades. Not at all, Your Honor. It's important to note that the agency had the position that we're talking about first articulated in 1988 in the handbook. Then in 2008, they issued an opinion letter, and then in 2009, they issued opinion letters not applying that 20 percent limitation. We cite those in the papers, at least the 2009 letter, the January 15, 2009 letter. The January 16, 2009 letter, they expressly pulled back and rejected this 20 percent standard. Six weeks later, they pulled that back then. Oh, they withdrew the letter. Yes. Okay. But it was an officially issued letter that six weeks later, after the administration changed, they pulled it back. You're counting that as vacillating in this case? Is that what you mean when you say vacillating? No, I'm coming to the vacillation in this case. Okay. In 2012, the Department modified substantially its provision, completely rewrote the provision in the handbook. They modified it in a way that is very germane to this case. They said that maintenance work now is unrelated. You can't take a tip credit for any time spent on maintenance work and on cleaning specifically. Then they didn't announce that publicly, to Your Honor's question of Plaintiff's counsel. They didn't announce that publicly until after they disclosed that change in their amicus brief in this case in 2016. Yes, but maintenance work, I mean, I appreciate that, and I don't think that's different than what is in the briefing that I've already read, but maintenance work or going to check the bathroom to make sure it's clean strikes me as something that is clearly consistent with the earlier opinion letters and where anybody with common sense would draw the line. With all due respect, Your Honor, no, because the O-Net database, for example, lists cleaning bathrooms, checking and cleaning bathrooms as part of the task of servers. I'm not talking about going and spending four hours fixing all the plumbing, but light cleaning in bathrooms is absolutely part of tipped occupations. Consistent with being a waitress. Yes, Your Honor. That is a long-recognized one of about two dozen tasks. Well, counsel, just because employers require their servers to do that, does that necessarily mean that that's part of the waitress' job? Coupled with the fact that this is the — It seems pretty circular to me. Coupled with the fact that the database that the Employment and Training Administration, another agency at the Department of Labor, uses that treats as authoritative for purposes of figuring out how do we get people trained for and into jobs. They treat that as one of the tasks. I don't know. I don't think I'd want my waitress cleaning the bathrooms. I don't even want mine checking to see that the bathroom has been cleaned. Well, doesn't that just reflect a database that says people have a lot of dual tasks? It's a database that collects from the industry, right? It's input from the industry. Isn't that fair? From the Bureau of Labor Statistics, from industry? It is a factual survey that represents what is actually happening in restaurants. And what's important is when we — But that goes to Judge Boydlaw's question, which — and I'm not sure that we've given you a chance to answer it, but her question really is, doesn't that just reflect that an employer out there is requiring a waitress to do that? No, Your Honor, because, again, when we come back to the legislative history in 1966, when these provisions applied to the restaurant industry for the very first time, the FLSA didn't apply to them before. Congress was very clear when they said that they wanted to permit the continuance of existing practices with respect to TIPS. That's Senate Report 89-1487. They expressly did not want to upend the practices. They did not want to remake the restaurant industry. All they wanted to do was to ensure that employers provided at least a minimum cash wage equal to then half of the then-current minimum wage. That's all that Congress was doing. They weren't trying to micromanage or reshape these roles. So — and when we're talking about dual jobs, what we're talking about is there are lots of tasks in the restaurant industry where the same task might belong to multiple positions. That's not dual jobs. That is Venn diagrams that have some overlap. That's very different from a dual-job scenario. And I think — Could the — excuse me. Could the department, in effect, throw up its hands at some point and say, look, we've done all these surveys and there's related jobs and there's unrelated jobs. And rather than spend our time in the weeds on this, we're going to come up with a 20 percent rule? Why isn't that a reasonable interpretation of the statute? Because, again, the 20 percent rule would incorrectly sort busboys, countermen, service bartenders, two or three of the six tasks and occupations that Congress has expressly said in Senate — But you conceded before in response to the chief judge that a 50 percent rule would be OK. A 50 percent rule would be OK if it reflected tasks within the occupation on a workweek-by-workweek basis. In other words, we're going to — But I'm saying what the department said, we've been doing these surveys and the tasks keep expanding and contracting and we can't tell what's related and unrelated, so we're just going to adopt a percentage rule. I take it your position is that the department did that, 50 percent would be OK, but 20 percent would not. It's a question of percentage of what? If we're talking about percentage of time spent on activities that are within the tipped occupation — I'm talking about percentage of the work — I'm talking about percentage of the workweek. The department says we're at this point unable because employers assign so many tasks to micromanage what they are. So we're going to adopt a percentage rule. If you spent 50 percent of your time on tip-producing work, that's fine. If you don't, it's not fine. You would be OK with that regulation, would you not? Absolutely not, Your Honor, because what you're talking about is the difference between focusing on time spent pursuing tips versus time spent on tasks associated with the occupation. It would be legitimate for the department to say we're going to look at whether the employees are spending their time on activities that are within the scope of the occupation. That's legitimate. What is not legitimate is using pursuit of tips and those activities as a proxy for actually analyzing the occupation. That's where the department has gone too far. Your time has expired unless there are further questions. Thank you, Counsel. Thank you, Your Honors. So my brother just referred to the 1966 Senate report that tip provisions are sufficiently flexible to permit continuance of existing practices with respect to tips. That doesn't mean continuing the practices with respect to the tip credit because the tip credit didn't exist. It just the rest of that paragraph, if you just dig into that section of the Senate report, it just talks about not job duties or what constitutes a tipped occupation. It talks about the mechanics of how tips are collected and pooled. So it's not talking about job duties. This idea that focusing on tips is a bridge too far is quite remarkable because we're talking about the tip credit. It's called the tip credit. It's not the janitor credit. It's not the dishwasher credit. It's the tip credit. And the whole centerpiece of it is that you get to bump your earnings up from $2.13, hopefully to minimum — certainly to minimum wage, hopefully to a living wage, which is the entire point of the FLSA. And I think — But the statute does use the term tipped employee, which does use the language any employee engaged in an occupation. So that doesn't focus on tipped activities. It focuses on engaged in an occupation. So how does that relate to your argument? So it's certainly ambiguous. Tipped employee means an employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips. So my colleague would read that as a tipped employee is just someone who gets $30 a month in tips. Whatever we think of Congress, we don't think that it uses language like engaged in an occupation for absolutely no reason or customarily and regularly for no reason. So it's focusing on what are you doing. What is your occupation? What is your role? What is your job? What are you doing with your time that customarily and regularly gets you tips? So it's ambiguous. We have — you have to interpret it. The Congress also instructed the DOL to interpret it. In the 1966 report at page 844, it said the DOL must — should promulgate regulations and rules and orders to implement our wishes. So it's got to do something beyond 56E. And it's done that in the opinion letters. It's done that in the Field Operations Handbook. And so it's interpreting this ambiguous term of occupation. And it's going back to the title in 203M. It's a tip credit. What does that mean? It's a tipped employee. What does that mean? Well, it's too easy for a restaurant to circumvent congressional intent by handing them a broom and saying, stay away from the customer for the next two or three hours. I didn't hire a janitor, so you've got to go do that. I think also the 50 percent — May I ask you one question? Your opponent says that he'd be satisfied. I'm not sure I understand what he'd be satisfied with. But I think he said this would be Skidmore deference. What would be the result if we did use Skidmore deference? As to the regulation? Yes, I think that the — so you can apply Skidmore deference to both the regulation and the interpretive work that's been done by the DOL. So to answer your question, I think under Skidmore deference, the dual jobs regulation is a reasonable implementation of the tipped employee definition in the FLSA. What does it mean to be engaged in an occupation that customarily yields tips? Well, it wouldn't make sense for a hybrid person who's doing maintenance work or janitorial work or dishwashing work and waiter work to be deemed a tipped employee for all time. The 50 percent rule is a way of doing it, but it allows a huge amount of subversion of the FLSA's purpose to ensure a fair day's pay for a fair day's work, to prevent chiseling of wages, and to provide dignity and security for American workers, as the Court said in Orla. With half of waiters and waitresses on government support, I think that's really important to keep in mind. So under Skidmore, the 56E is completely reasonable and valid for this Court to take into account. If the Court were to follow defense counsel's proposal of taking a sledgehammer to the DOL and just wiping away the field operations handbook, wiping away the amicus work and the letters, then we still have to create a rule. And we're starting with the concept of the tipped credit. What is tipped work? And then the regulation, the dual jobs regulation, is a reasonable interpretation of that. And from there, you have to have some kind of reasonable bounds around what a restaurant can do. The restaurant arguably owes its shareholders a duty of ensuring that it's paying its workers as little as possible. And this Court has the job, just like the Eighth Circuit did, and just as the Fifth, Sixth, Seventh, and Tenth Circuits have, in grappling with these issues. And if you read those opinions from all those circuits, we have not a single judge who has disavowed the 20 percent rule. We have not a single judge who has gone into this outlier position that our district court judge has. I think our district court judge is responsible for about a third of the decisions in this nation that reject the 20 percent rule. Sotomayor, what thing I do take issue with is your suggestion that the restaurant owes its either stockholders or owners to pay the least amount possible. I mean, I think what they owe is to abide by the law, and that's what this debate is about. So I think that's a bit of an unfair characterization. There's an open question of if you can get away with it and no one's going to hold you accountable, do you owe your shareholders that duty? I would hope that we don't live in that world, but sometimes we do. I want to also note a mistake that I made at the earlier argument that my brother referred to. I answered a question from Judge Ikuda at the end of the argument about whether the duties were intermingled, and I think I had an imperfect memory of the record, and I think I may have misunderstood the notion of intermingling. So I certainly did not intend to concede that the job duties were always intermingled, because we have both intermingling and we have work that's done before and after the restaurant is open. So, for example, Sylvia Alarcón is one of the plaintiffs, and she has allegations that she did work before opening for about two hours every pay period. She has about 11 hours of allegations of after shift working, mopping the floors for two hours, cleaning the soft drink machine, deconstructing it, cleaning the parts, soaking the nozzles, using bleach, that kind of thing, for three hours, deep cleaning the booths, cleaning the mini-fridge for two hours, scrubbing the walls for three hours. So those are all post-shift. She does also assert that she did work during the shift, cleaning the ceilings, cleaning the fans with chemical soaps, loading and unloading the dishwasher, doing stock work for four hours, that kind of thing. So there is intermingling, and there is also separability. The key is that the restaurant determines the structure of the workplace. They determine who to hire. They determine what jobs the people are going to do. And it's only on the restaurant to pull the waitress away from the customers if that's what they want to do. Thank you, counsel. I'm sorry I didn't mean to interrupt. We're out of time. Go ahead with one question. Okay. No, I just want to ask a very quick question. What would you have us do in this case? Assuming that you prevailed, what should we tell the district court to do? I think that the court should follow our, but also as a backup, follow Skidmore. I'm asking what are we telling the district court to do? Assuming that you prevail, what should we tell the district court to do in this case? Tell the district court to follow the 20% rule and allow the plaintiffs to move forward with their allegations. He kicked out the case for failure to state a claim. Excuse me? I'm sorry. He dismissed the case for failure to state a claim. Yes, Your Honor. Correct. So it goes back, and then we move to the next stage, file an answer and get the case moving. Right. We just start. We haven't started yet because he doesn't believe in this line of authority. So I think both under our and under Skidmore, you can affirm along the lines that Judge Graber, you did in the Encino Motorcars, as a backup, we have adequate confirmation that this is reasoned, consistent, thorough, and persuasive over the past 50 years of analyzing these questions. Thank you, Your Honors. Thank you, counsel. The case is argued to be submitted for decision and will be in recess. All rise.
judges: Reinhardt, Thomas, McKeown, Wardlaw, Graber, W. Fletcher, Paez, Rawlinson, Ikuta, Christen, Hurwitz